

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

HDM:DCP
F. #2016R01428

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 2, 2024

By Hand and ECF

The Honorable Diane Gujarati
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

      Re:    United States v. Joseph Modile
                Criminal Docket Nos. 21-108 and 23-50 (DG)

Dear Judge Gujarati:

      The government submits this letter in connection with the defendant's sentencing in the above-referenced cases.  For the reasons set forth above, the government respectfully submits that a sentence of 120 months' imprisonment is sufficient, but not greater than necessary, for both cases.

      On February 27, 2023, the defendant pled guilty, pursuant to a plea agreement with the government, before Magistrate Judge Ramon Reyes to charges contained in two separate charging instruments, an indictment filed in the Eastern District of New York (the "EDNY Indictment") and an information filed in the Southern District of Texas (the "SDTX Information"). The defendant pled guilty to Counts One and Three of the EDNY Indictment, charging the defendant with (i) conspiracy to commit bank and wire fraud, in violation of 18 U.S.C. § 1349 and (ii) aggravated identity theft, in violation of 18 U.S.C. § 1028A.  As set forth below, the charges in the EDNY stemmed from the defendant's participation in a sophisticated bank and wire fraud conspiracy in which funds were stolen from home equity lines of credit ("HELOC") opened in the name of victim individuals as well as the conspiracy to launder the proceeds of the HELOC scheme as well as a business email compromise ("BEC") scheme.  The defendant also pled guilty to both counts of the two-count SDTX Information charging him with (i) money laundering, in violation of 18 U.S.C. § 1956(a) and (ii) wire fraud, in violation of 18 U.S.C. § 1343, in connection with funds stolen from different HELOC accounts and laundering the proceeds of that fraud.  The Court accepted the defendant's guilty pleas on May 11, 2013.

1

I.   Factual Background – Offense Conduct

   A.   The EDNY Criminal Conduct

      1. HELOC Bank and Wire Fraud Scheme – Eastern District of New York

Between late 2015 and September 2018, Modile, together with his co-conspirators, operated a sophisticated fraud scheme to obtain fraudulently the proceeds from a HELOC, a revolving line of credit extended to a borrower by a financial institution and secured by the equity in the borrower's home. Specifically, the defendant and his co-conspirators took control of existing bank accounts, at times using fraudulent identification documents to impersonate the real account owners, and then stole money by drawing down on the HELOCs using cash withdrawals, wire transfers and checks.

As part of the scheme, the defendant sent information about the victims and the banks to target from to Olanrewaju (Larry) Popoola and other co-conspirators. The defendant and his co-conspirators then acquired the personal identifying information of the actual holders of the targeted bank accounts, including Victim #1 and Victim #2. The co-conspirators used that personal identifying information to impersonate the actual holders of the targeted bank accounts, thereby gaining control of the accounts. In some cases, Popoola and his co-conspirators recruited "runners," who impersonated the actual account holders inside bank branches using forged and fraudulent identification documents created at the direction of the co-conspirators. The defendant created fraudulent identification documents the runners used to impersonate the real account holders at the bank.

Popoola would find a live person who matched the physical profile of the HELOC account holder to act as a "runner" and go into the bank to conduct financial transactions posing as the actual holder of the HELOC account. Popoola would then send a picture of the runner to his co-conspirators to get their approval. The defendant's co-conspirators would then send Popoola a picture of the HELOC account holder's signature, so that the runner could practice it before going to the bank.

Once the runner was recruited, the defendant received a passport photo of the runner. The defendant would then send Popoola a fake identification document containing the HELOC account holder's information and the runner's picture. Evidence recovered from the defendant's phone included forged documents in the names of the HELOC holders. The fraudulent identification documents created by the defendant were used to impersonate the account holder and gain control of the account.

In other cases, the co-conspirators called the banks in question, impersonated the actual account holders, and changed information associated with the accounts, such as the registered address or the login information for online access to the accounts. The victims of the HELOC scheme suffered an intended loss of $11,200,000 and an actual loss of more than a million dollars.

2. The Money Laundering Schemes

In addition to the HELOC bank and wire fraud scheme, the defendant also played a critical role laundering the fraudulent proceeds from the HELOC scheme, as well as an unrelated BEC fraud scheme.

a. The HELOC Scheme

After gaining control of the targeted bank accounts, the defendant and the co-conspirators obtained money from the accounts by, among other means, withdrawing cash, purchasing official checks, sending wire transfers, writing checks, and using debit cards to purchase money orders.

The funds stolen from the targeted bank accounts were then deposited into other bank accounts controlled by the co-conspirators to conceal the origin of those funds. In some cases, the stolen funds were first deposited into bank accounts set up by the co-conspirators in the name of the actual holders of the targeted HELOC bank accounts from which the money had been stolen. The purpose of this was to make the initial transfer of the proceeds of the HELOC fraud less suspicious since it was going to a bank account purportedly owned by the HELOC account holder. In other cases, the defendant's co-conspirators would open bank accounts in the names of sham corporations into which the stolen funds were first deposited. The defendant and his co-conspirators used false and fraudulent identification documents created by the defendant to both to create the sham corporations and to establish bank accounts for those sham corporations and actual holders of the targeted bank accounts. In both cases, the co-conspirators, Popoola and the runners would then made additional transfers of the stolen funds to further conceal their origin. Popoola would direct the runner to go into the bank and conduct financial transactions (wire transfers, cash withdrawals, purchase of cashier's checks) in order to fraudulently obtain money from the HELOC account.

Popoola would provide the information to control these accounts (and others involved in the scheme), such as usernames, passwords, and other login credentials, to his co-conspirators so they could take control of the funds after the initial transfers. The defendant and Popoola laundered over a million dollars as part of the HELOC Scheme.

b. The BEC Scheme

In or about May 2018, Modile played a key role in a scheme to launder $10.2 million stolen from a company (Company #1) as part of a BEC scheme. Prior to the fraud, Popoola had registered a shell company purporting to be a construction company (the "Construction Company) and opened a bank account for the Construction Company (the "Construction Company Account"). The signatories to the account were two women that Popoola recruited to be nominee account holders.

Before the BEC fraud occurred, a co-conspirator ("Co-Conspirator #1") contacted Popoola and told him that he needed an account, which Popoola understood was an account that Co-Conspirator #1 needed to pass proceeds through from some sort of illegal activity. Popoola sent Co-Conspirator #1 the account number, routing number and names of signatories for the Construction Company Account.

Thereafter, Popoola got a call from Co-Conspirator #1, who told him to check the Construction Company Account and call him back. Popoola saw that the account had a balance of approximately $10 million. Popoola knew that the money in the account had been stolen from Company #1, a professional sports franchise, because Co-Conspirator #1 had provided him with a screen shot informing him that the money had come from Company #1, so that Popoola and his runners would have the source in case the bank called.

Later that day, Co-Conspirator #1 sent Popoola a series of text messages and a "notepad file" directing Popoola how to write checks from the Construction Company Account, how much to write the checks for, and what to put in the memo line. The proceeds of the fraud were then sent from the Construction Company Account to bank accounts for a series of shell companies connected to the defendant and other co-conspirators. Indeed, evidence recovered from the defendant's apartment included documents related to the creation and management of the shell companies, including certificates of formation and blank checks.

Popoola directed his runners who controlled the Construction Company Account, to write the checks as Co-Conspirator #1 had directed. Popoola sent Co-Conspirator #1 pictures of the checks. Popoola also sent some of the checks to Modile at an address that Co-Conspirator #1 gave to him and also gave a check to an individual named "Al" for Modile. Popoola and his runners later went to an ATM to withdraw cash from the Construction Company Account, which they kept. Law enforcement agents found evidence of Modile laundering the proceeds of the BEC fraud including photographs of checks and bank receipts demonstrating deposits of the fraudulent proceeds into the shell company accounts he controlled.

Although Modile and his co-conspirators fraudulently obtained more than $10.2 million from Company #1, law enforcement learned of the fraud before the defendant was able to launder all of the money and were able to recover $9,058,000, which was returned to Company #1. Accordingly, Modile, Popoola and their co-conspirators were able to keep approximately $1.142 million of the initial $10.2 million that was stolen.

B.  The SDTX Criminal Conduct

In or about and between November 2017 and May 2018, Modile, together with others, participated in a different HELOC scheme that defrauded at least three victims of over $358,000. As part of the fraudulent scheme, the defendants' co-conspirators took control of existing bank accounts, at times using fraudulent identification documents to impersonate the real account owners, and then stole money by drawing down on the HELOCs using cash withdrawals, wire transfers and check.

Modile played an important role laundering of the fraudulent proceeds from Victims 3-5 and further facilitate the fraud. For instance, Modile facilitated the creation of fraudulent bank accounts, using fraudulent identification documents, that were used to initially receive the money obtained from Victims 3 and 5. Because those bank accounts were fraudulent, they served to conceal the nature of the fraudulent proceeds and facilitate subsequent transfers to Modile and his co-conspirators. Modile also coordinated using co-conspirators, including Individial-1, who was based in Houston, Texas, to facilitate the wire fraud and money laundering scheme. Modile used his cellular phone to call Individual-1 in Houston, Texas about financial transactions necessary to execute the scheme to defraud.

'For instance, in or about February 2018, Modile mailed fraudulent checks from his residence in California to Individual-1 in Houston. At his direction, Individual-1 deposited the $97,410.00 check in a Chase Bank account on February 13, 2018. The check Modile sent to Individual-1 were from the funds that were fraudulently obtained from Victim-3 Once the check cleared, Modile sent a text message to Individual-1 directing her to withdraw the money and split it with Modile. Both Modile and Individual-1 knew the money withdrawn from the bank represented proceeds of unlawful activity. The purpose for that transaction was to disguise the nature of the unlawful activity, which was the creation of the fraudulent check. In or about and between February and March 2018, Individual-1, acting at the direction of Modile, also facilitated the fraudulent transfer of funds obtained through Modile's fraudulent scheme from Victim 4 and Victim 5.

II.  Sentencing Guidelines Range

    A.  Applicable Guidelines Range

The government respectfully submits that the appropriate United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") calculation is set forth below:

EDNY Indictment (21-CR-108)

Count 1 – Conspiracy to Commit Bank and Wire Fraud

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2B1.1) | 7 |
| Plus: Loss Exceeded $9,500,000 (§ 2B1.1(b)(1)(K)) | +20 |
| Plus: Sophisticated Means (§ 2B1.1(b)(1)(C)) | +2 |
| Plus: Unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification (§ 2B1.1(b)(11)(c)(i)) | +2 |
| Total Offense Level: | 31 |

Count 3 – Aggravated Identity Theft

Base Offense Level (2B1.6). Term of imprisonment required by statute of 24 months.

SDTX (23-CR-050)

Count One (SDTX Information): Money Laundering

| | |
|---|---:|
| Base Offense Level (§§ 2S1.1(a)(2), 2B1.1(b)(1)(G)) | 20 |

| | | |
|---|---|---:|
| Plus: | Convicted under 18 U.S.C. § 1956 and in the business of laundering funds (§ 2S1.1(b)(2)(C)) | +4 |
| Plus: | Supervisory Role Enhancement (§ 3B1.1)) | +2 |
| | Total Offense Level: | 26 |

Count Two (SDRX Indictment): Wire Fraud

| | | |
|---|---|---:|
| | Base Offense Level (§ 2B1.1) | 7 |
| Plus: | Loss Amount (§ 2B1.1(b)(1)(G)) | +12 |
| Plus: | Sophisticated Means (§ 2B1.1(b)(10)) | +2 |
| | Total Offense Level: | 21 |

Multiple Count Analysis (U.S.S.G. §§ 3D1.1, 3D1.2, 3D1.3, 3D1.4)

| | Levels | Units |
|---|---:|---:|
| Group 1 (Count One - EDNY) | 31 | 1 |
| Group 2 (Counts One and Two - SDTX) | 26 | 1/2 |
| Total grouped offense level: | 32 | 1 1/2 |

Thus, the defendant's total adjusted offense level is 32. Subtracting three points for the defendant's timely acceptance of responsibility and the defendant's total adjusted offense level is 29. For the reasons discussed in detail below, the defendant's criminal history category is IV. Based on a total offense level of 29 and a criminal history category of IV, the defendant's Guidelines range of imprisonment is 121 to 151 months' imprisonment. With the 24 month mandatory minimum consecutive sentence required for the defendant's conviction on Count 3, the defendant's Guidelines range is 145-175 months' imprisonment. This Guidelines range matches the range contained in the defendant's plea agreement and the defendant has stipulated to that Guidelines range. See Defendant's Letter dated January 26, 2023 (DE 49).

   The government's calculation set forth herein differs in one respect from the Guidelines advanced by the United States Department of Probation ("Probation") in the Presentence Investigation Report dated September 12, 2023 (the "PSR"). As noted above, the government has included an enhancement in the Guidelines calculation for Count One of the EDNY Indictment for the unauthorized transfer or use of any means of identification to produce or obtain any other means of identification, pursuant to U.S.S.G. § 2B1.1(b)(11)(c)(i). This enhancement should be applied given the defendant's conduct in committing the criminal offense charged in the EDNY. As noted in the Guidelines, this provision applies in a case "in which the means of identification of an individual other than the defendant…is used without the individual's

6

authorization unlawfully to produce or obtain another means of identification." See Sentencing Guideline Section 2B1.1 Application Note 10(c). That is exactly what the defendant did in this instance on multiple occasions. The defendant used the identity of the account holder to obtain false identification documents in the name of the account holder, but with the picture and signature of another person, in order to facilitate taking over the account. (PSR ¶¶ 10, 26). Accordingly, the enhancement should be applied.

Although the difference between the Guidelines calculations advanced by the government and by Probatiton is two levels, the operation of the grouping analysis serves to narrow the gap so the total offense level only differs by one.

### B. The Guidelines Accurately Reflect the Defendant's Criminal Conduct

Although the defendant has stipulated to the Guidelines calculation, he claims that the loss calculation is overstated because the loss amount is based on intended loss and not actual loss. See DE 49 at 2, Defendant's Sentencing Memorandum, dated December 28, 2023 (DE 47) ("Def. Mem."). The defendant's argument misses the mark because the $11.2 million loss is not intended loss – it is an actual loss under the Guidelines.[1] With regard to the BEC scheme involving Company 1, the defendant and his co-conspirators actually stole $10.2 million from Company 1. The full amount of money was transferred by Company 1 to the defendant's co-conspirators and the defendant and his co-conspirators began to launder the proceeds that were stolen. Under the Guidelines, that is actual loss. The Guidelines define "actual loss" as "reasonably foreseeable pecuniary harm that resulted from the offense." Sentencing Guideline Section 2B1.1 Application Note 3(A)(i). When the defendant and his co-conspirators had knowledge that a company actually wired $10.2 million to an account they controlled under false pretenses and then began passing it through accounts they controlled to conceal the origin, it was reasonably foreseeable that the victim would suffer pecuniary harm in that amount.

To the extent that that the defendant argues the loss is overstated because law enforcement authorities learned of the fraud and were able to freeze and return over $9 million of the fraudulent proceeds to the victim company, he is wrong as a matter of law. The Guidelines make plain that a defendant is only entitled to a credit toward the loss calculation if money is returned to the victim "before the offense is detected." Sentencing Guideline Section 2B1.1

---

[1] In support of his argument, the defendant cites to Kisor v. Wilkie, 139 S.Ct 2400 (2009), arguing that application of intended loss is inconsistent with the Guidelines because the Guidelines are not genuinely ambiguous on loss. (Def. Mem. at 7.) The defendant claims that Kisor and a Third Circuit case, United States v. Banks, 55 F.4th 246 (3d Cir. 2022), preclude application of intended loss in calculating the Guidelines. (Def. Mem. at 8). As noted above, the loss underlying the defendant's Guidelines calculation is based on actual loss and not intended loss, so Banks and any cases relying on it are inapposite. Nonetheless, the government notes that Banks is not binding law in this Circuit and courts in this Circuit remain free to consider intended loss following Kisor. See United States v. Pagartanis, 18-CR-374 (JMA), 2023 WL 4471947, at *6, n. 3 (E.D.N.Y. July 11, 2023) (noting, in the context of a § 2255 petition advancing an argument related to Banks, that the argument had been waived but "[e]ven if this argument had been raised, this Court would have, based on then-binding Second Circuit precedent, still concluded that it is permissible to rely on intended loss.")

Application Note 3(E) (emphasis added). As noted above, a portion of the stolen funds were only returned to the victim company after law enforcement learned of the fraud and quickly acted to return the funds. The funds were not returned before the offense was detected nor were they returned because of any efforts by the defendant. Accordingly, the Guidelines calculation is both correct and accurately reflects the defendant's conduct. See, e.g., United States v. Shkreli, 15-CR-637 (KAM), 2018 WL 9539774, at *28 (E.D.N.Y. Feb. 26, 2018), aff'd, 779 F. App'x 38 (2d Cir. 2019) (denying credit against loss because the defendant began to funnel money back to his investors after "many of the investors, as well as the Securities and Exchange Commission, had detected the fraud.")

C. The Defendant is Criminal History Category IV

The defendant claims that the criminal history category set forth in the PSR is incorrect for two reasons. First, the defendant claims that his convictions in May 2018 and March 2019 should not qualify as prior convictions in his criminal history calculation because they are "part of the broad fraudulent conspiracy which appears to have spanned several jurisdictions." (Def. Ltr. at 10). Second, the defendant argues that he should not have received two criminal history points for committing the instant offenses while on supervision. (Id. at 11). While his prior convictions should be included in his criminal history calculation, the government agrees that the defendant did not commit either of the existing offenses while on supervision. Accordingly, the defendant should have 8 criminal history points, which leads to Criminal History Category IV.

1. The Defendant's 2018 and 2019 Convictions Constitute Prior Sentences

The defendant's argument that two of his convictions should not qualify for criminal history points because they are not "prior sentences" should be rejected. As the defendant notes, the Guidelines commentary provides that a prior sentence:

> means a sentence imposed prior to sentencing on the instant offense, other than a sentence for conduct that is part of the instant offense. See § 4A1.2(a). A sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is a prior sentence if it was for conduct other than conduct that was part of the instant offense. Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct).

Commentary U.S.S.G. 4A1.2 Note 1.

Pursuant to U.S.S.G. § 1B1.3, relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a); see also United States v. Uribe-Jimenez, 12-CR-00603-FB, 2023 WL 6587305, at *2 (E.D.N.Y. Oct. 10, 2023); United States v. Thomas, 54 F.3d 73, 83 (2d Cir. 1995). "Thus, a sentence imposed for conduct that was part of the same course of conduct as the offense

8

of conviction is not a 'prior sentence' within the meaning of Section 4A1.1." United States v. Brennan, 395 F.3d 59, 70 (2d Cir. 2005).

Acts can be the "same course of conduct if the defendant engaged in a repeated pattern of similar criminal acts, even if they were not performed pursuant to a single scheme or plan." United States v. Bryant, 356 F. Supp. 3d 216, 220 (D. Conn. 2018) (quoting Thomas, 54 F.3d at 84); see also United States v. Perdomo, 927 F.2d 111, 115 (2d Cir. 1991) ("The 'same course of conduct' concept ... looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be 'connected together' by common participants or by an overall scheme."). As the Bryant court held, "[c]onduct resulting in a prior conviction is not relevant conduct to the instant offense when it is a 'severable, distinct offense." 356 F. Supp. 3d 216 at 220 (citing United States v. Stone, 325 F.3d 1030, 1032 (8th Cir. 2003)). "Factors useful in determining whether the two offenses are severable and distinct are temporal and geographic proximity, common victims, common scheme, charge in the indictment, and whether the prior conviction is used to prove the instant offense." Id. (citing Stone, 325 F.3d 1032 and United States v. Copeland, 45 F.3d 254, 256-57 (8th Cir. 1995)).

Jurisprudence from this Circuit establishes that courts have required a connection between offenses similar to the standard set forth in Bryant; simply committing the same or similar crime is not enough. For example, in Brennan, the Second Circuit found that a prior conviction for bankruptcy fraud was relevant conduct to a conviction for criminal contempt for violating a freeze order on the defendant's assets as they both involved, "concealing, laundering, investing, and using of [the defendant's] assets for [their] own purposes without the knowledge or consent of the bankruptcy estate or [their] judgment creditors." Brennan, 395 F.3d at 70. In Thomas, the Second Circuit noted that prior convictions for possessing property using forged money orders was relevant conduct to defendants' convictions for the underlying forgery of the same money orders, and should therefore not be considered as prior sentences under the Guidelines. See Thomas, 54 F.3d at 83. In Bryant, the court found that a defendant's prior state court conviction for tampering with physical evidence was part of the same course of conduct to the defendant's conviction for conspiracy to distribute cocaine base because the prior conviction for evidence tampering "was in furtherance of the drug conspiracy" and "occurred in the same place and at the same time by the same people." See 356 F. Supp. 3d at 220; see also United States v. Butler, 970 F.2d 1017, 1025 (2d Cir. 1992) (acts of arson and assault in aid of a scheme of extortion against a given victim could support a finding of common scheme or plan).

The defendant's claims that all of his criminal conduct is part of an undefined "larger conspiracy," united by "multiple types of fraud, and that used or tried to obtain false identification documents to commit that fraud." (Def. Mem. at 10). The defendant's argument sweeps too broadly under the legal framework cited above. Under the defendant's reading of the Guidelines, a multi-year course of fraudulent criminal conduct that is unbounded by jurisdiction, involves entirely different victims, different criminal charges, with predominantly different participants would all qualify as one conviction. That conclusion is inconsistent with the applicable law and common sense.[2] The only common link between these schemes was that they

---

[2] Adopting the defendant's argument here would also lead to a situation where the defendant's criminal conduct is not factored into his sentence. If the defendant's criminal

9

took place in the same multi-year span and the defendant committed fraud and created false documents. The rest of the conduct is different. As such they are "severable, distinct" offenses and should be counted as separate offenses. Bryant, 356 F. Supp.3d at 220.

For example, the defendant's March 2019 conviction involved obtaining a false passport and stealing another individuals' identity. While the offense involved identity theft, it involves none of the same individuals in the charged scheme and there is no indication the defendant used a fraudulent identity to commit a financial crime or defraud a victim. Similarly, the defendant's 2018 conviction involved obtaining U.S. Treasury checks for IRS tax refunds, which were deposited in a bank account controlled by the defendant. Although the government does not have information regarding whether the defendant had co-conspirators in that case, or who they were, the nature of the fraud is different. Rather than obtaining HELOC funds and passing them through multiple accounts, the defendant stole tax refund checks and deposited them in accounts he controlled. The only common thread is that the defendant committed a fraud – none of the commonality or interconnectedness of Thomas, Bryant, Brennan or Butler is seen in the defendant's prior convictions here.

Accordingly, the defendant should receive six criminal history points for the 2018 and 2019 convictions.

### 2. The Defendant Should Not Receive Criminal History Points for Committing the Offense While on Supervision

The government agrees with the defendant that he should not have received two criminal history points for committing the offenses set forth in the SDTX Information while under supervised release. (PSR ¶ 73).

As an initial matter, the defendant's criminal history category would be IV regardless of whether he was on supervised release at the time he committed the offenses set forth in the SDTX Information. As the defendant notes, the 2023 Guidelines Manual, which was made effective in November 2023, has the effect of only applying one additional criminal history point pursuant to U.S.S.G. § 4A1.1(e), had that provision been applicable to the defendant.[3] Thus, even if the Court applied § 4A1.1(e) would increase the defendant's criminal history score from 8 to 9, which would mean the defendant would remain in criminal history category IV.

Moreover, the defendant was not on supervised release when he committed the offenses of conviction set forth in the SDTX Information. As alleged in that charging instrument, the crimes underlying those charges occurred from November 2017 through May 2018, which is the date on which the defendant was arrested in California on different fraud charges. (PSR ¶ 70).

---

conduct were determined to be relevant conduct, the loss amount and other enhancements should be factored into his Guidelines calculations, which would likely increase his sentence. The government is not in a position to ascertain the Guidelines impact, including the financial harm, for the defendant's two prior cases.

[3] The 2023 Guidelines Manual was released after the PSR was disclosed in September 2023.

Thus, the defendant could not have been on supervised release when he committed the offenses set forth in the SDTX Information. Moreover, although it was not raised in the PSR, the defendant was also not on supervised releasee when he committed the crimes set forth in the EDNY Indictment. As disclosed in the PSR, the defendant was on supervised release in the Southern District of Florida following his 2008 conviction for bank fraud until June 25, 2014. The EDNY Indictment alleges a conspiracy that began in January 2014, which would mean that the defendant was on supervised release at the time he committed the conduct in Count One of the EDNY indictment. However, the January 2014 date is when the conspiracy began. The government does not have evidence that the defendant joined that conspiracy until the middle of 2015. Accordingly, the defendant was not on supervised release at the time he committed the offenses charged in either of the instant cases.

For each of the reasons set forth above, the government respectfully submits that the defendant's criminal history score is 8, which leads to a criminal history category of IV.

III.    The Defendant's Criminal Conduct

   A.    Nature and Circumstances of the Offense

There is no doubt that the defendant's conduct was serious, widespread and directly led to millions of dollars in losses, which lined his pockets and those of his co-conspirators. The defendant's sophisticated HELOC fraud schemes, in two separate parts of the country, stole victims' identities to take control of their bank accounts and lines of credit and made away with hundreds of thousands of dollars from unsuspecting victims. It is difficult to imagine a fraud that hits a victim more directly than simultaneously learning that your identity, including your most private personal information, has been stolen and used to steal hundreds of thousands of dollars in credit or savings that was secured by an interest in your home. And the defendant's role in this criminal conduct was critical. He created and disseminated the critical fraudulent identification documents that enabled the co-conspirators to take control of the accounts and steal the funds from the account holders.

Similarly, the defendant's conduct as part of the money laundering schemes is also incredibly serious. The defendant used a sophisticated system of fraudulent shell companies and bank accounts to conceal the proceeds of a number of fraudulent schemes in Texas and in this district. The money laundering scheme in Texas, which the defendant led, was a critical part of the fraud because it enabled the ill-gotten proceeds to be concealed and disbursed to the co-conspirators. And the defendant's co-conspirators jeopardized the financial condition of Company #1 and a critical project it was engaged in at the time when they defrauded the company of more than $10 million. The defendant played a key role in laundering the proceeds of the crime, coming away with more than a million dollars, before law enforcement learned of the fraud and stopped the damage. The defendant's conduct in executing the money laundering is particularly egregious – the defendant created and used fabricated documents and stolen identities to commit the money laundering. Indeed, it was not enough for the defendant and his co-conspirators to steal the victims' identities to commit the underlying fraud – they doubled down and again stole the victims' identities to create fraudulent bank accounts that were used to conceal the fraud.

B. <u>Nature and Circumstances of the Defendant</u>

Unfortunately, the defendant's criminal conduct in this case is not the first time that he has engaged in this kind of fraudulent conduct. Indeed, the defendant's past is riddled with criminal conduct, much of it involving fraud and fraudulent identity documents. Between 2006 and his arrest on the instant case, the defendant has four felony convictions, including three in federal court, for fraud-related conduct and/or creating or obtaining false documents. The defendant's criminal history demonstrates two critical points relevant to his sentencing. First, it represents his persistence to commit fraud, without regard to the consequences or the impact on his victims. Second, it represents a refusal to be deterred from engaging in fraudulent criminal conduct by a prison sentence. Despite serving a sentence a federal penitentiary, a lengthy term of supervised release and a probationary sentence in Florida state court, the defendant's criminal conduct actually got worse. The defendant went on to commit a litany of fraudulent conduct across the United States for a period of years. Only a lengthy prison sentence will send the message to the defendant that his conduct must end.

The defendant devotes a great deal of his sentencing letter to lamenting the number of jails he has been incarcerated in since his arrest in 2018. The defendant must acknowledge that his time in the Bureau of Prisons facilities is a direct result of the myriad criminal schemes he was involved in that led to four separate federal indictments. The government does note that the defendant was incarcerated through the entire COVID-19 pandemic, often under difficult circumstances, and has not incurred any disciplinary infractions in the years he has been in federal custody, including for his 2008 sentence. (PSR ¶ 97).

C. <u>Forfeiture and Restitution</u>

As part of his plea agreement with the government, the defendant agreed to a forfeiture amount of $1,167,375.18, which constituted the amount of proceeds the defendant collected as part of the criminal scheme in the EDNY. The government respectfully requests that the Court enter the Order of Forfeiture submitted by the government on February 2, 2024 as part of its sentence. <u>See</u> DE 50.

Restitution in the SDTX case in the amount of $358,774 is appropriate for the full amount of each victim's losses as set forth the plea agreement and the PSR. (PSR ¶ 117). The government has the contact information for each of the three victims in the Texas case and will provide them to the Court under separate cover.

With regard to restitution in the EDNY case, the government respectfully submits that restitution in the amount of $1,527,726.76 is the appropriate amount of restitution for victims with ascertainable loss amounts who have provided appropriate documentation to the government. Such an amount is consistent with a restitution order entered against one of Modile's co-conspirators, and the amount would be joint and several as to each defendant and other subsequent co-conspirators.

IV.	Conclusion

        For the reasons set forth above, the government respectfully requests that the Court sentence the defendant to a term of imprisonment of 120 months.

                                             Respectfully submitted,

                                             BREON PEACE  
                                             United States Attorney

                              By:   /s/ David Pitluck  
                                             David Pitluck  
                                           Assistant U.S. Attorney  
                                           (718) 254-6108

cc:	Sam Gregory, Esq. (by e-mail and ECF)  
     Senior United States Probation Officer Jennifer Fisher (by e-mail)